UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-20140-Civ-COOKE/BANDSTRA

RICHARD SHOTTLAND,

    Plaintiff
vs.

BERNARD HARRISON,

    Defendant.
_____/

## OMNIBUS ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS CASE is before me on Plaintiff and Counter-Defendant's Combined Dispositive Motion for Summary Judgment and Request for Award of Attorney's Fees and Costs (ECF No. 26) and Defendant's Motion for Summary Judgment (ECF No. 27). I have reviewed the arguments, the records, and the relevant legal authorities. For the reasons provided, both motions are denied.

### I. BACKGROUND

Plaintiff, Richard Shottland, brings this action for a declaratory judgment that Defendant Bernard Harrison's registered trademark for "Spider Harrison" is invalid and that Plaintiff's use of the trademark "Spyder Harrison" does not violate same. Harrison has filed a counterclaim for trademark infringement, unfair competition, cyberpiracy, and deceptive and unfair trade practices. The following facts are undisputed unless otherwise stated.[1]

### A. Shottland's Use of "Spyder Harrison"

Shottland states that he makes a living by providing voice-tracking services and voiceover services. Voice-tracking services involves creating pre-recorded radio broadcast services saved in a

---

[1] The facts set forth in the parties' respective Statements of Undisputed Facts are deemed admitted to the extent that they are supported by evidence in the record, and are not specifically disputed in an opposing statement of facts. S.D. Fla. L.R. 7.5(D); *see also Gossard v. JP Morgan Chase & Co.*, 612 F. Supp. 2d 1242, 1245-46 (S.D. Fla. 2009).

digital file, which he distributes to traditional and satellite radio stations for broadcasting. Voiceover services involve pre-recorded commercial and station identification and promotion services saved on a tape or digital file, which he distributes to radio and television stations, advertising agencies, car dealerships, and other types of advertising businesses for broadcasting. From 1973 to 2002, he also provided live broadcast services, consisting of on-air disc jockey performances. (Shottland Aff. ¶ 6, ECF No. 26-1).

In 1998, Shottland created a Florida corporation named Spyder Broadcasting, Inc. ("SBI"), which is a counter-defendant in this action. Through this company, Shottland provided voice-tracking services beginning in 2002 and voiceover services beginning in 1998. Also through SBI, Shottland maintains a number of websites, e-mail addresses, and social media accounts, most of which contains some variation of the name "spyder." (*See* Shottland Aff. ¶ 9). Shottland also registered websites and social media accounts with the name "Spider Harrison," which redirect Internet traffic to "Spyder Harrison" website and social media pages. (Shottland Dep. 130:10-20, ECF No. 27-2).

From February 2002 to the present, Shottland has provided voice-tracking services to satellite radio provider Sirius and Sirius XM[2] using the names "Spyder Harrison," "JJ Walker," and "The Jammer." (Shottland Aff. ¶ 4). Specifically, from February 2002 through 2009, Shottland, using the name "Spyder Harrison," performed as a host on Sirius's U.S. 1 channel and then on Sirius XM's Hits 1 channel, which included hosting a program called Weekend Countdown, which airs approximately 10-15 times per weekend. (*Id*.) According to Shottland, Sirius XM requires him to use the name "Spyder Harrison" on these channels and programs. (*Id*. ¶ 10).

From approximately March 2002 to the present, Shottland has provided voice-tracking

---

[2] Sirius XM emerged in 2009 as a result of a merger between satellite radio providers Sirius Satellite Radio and XM Satellite Radio.

services to various traditional radio outlets owned by Clear Channel Broadcasting, Inc. and CBS Radio Network across the nation. (*Id*.) He also provided voice-tracking services to individual, traditional radio stations in Miami, Florida and Abilene, Texas, from 2004 to 2010. (*Id*.)

From April 1993 to the present, Shottland has provided voiceover services for radio and television announcements, and various kinds of advertisements. (Shottland Aff. ¶ 5). For this work, Shottland does not identify himself by the name "Spyder Harrison," or by any other name. (*Id*.) Shottland provides these services through his company, SBI. (*Id*.)

Shottland made intermittent use of the name "Spyder Harrison" from 1973 to 2002, to provide live broadcasting services at a series of different radio stations in cities across the nation. (Shottland Aff. ¶ 6).

### B. Harrison's Use of "Spider Harrison"

Harrison states that he provides entertainment services, including live broadcasting, signing, hosting, interviewing, acting, voice tracking, and voiceovers, under the name "Spider Harrison," since 1960. (Harrison Aff. ¶ 2, ECF No. 27-1). He received the nickname "Spider" as a high school football player, and has used the name throughout his career. (*Id*. ¶ 3).

From 1968 through 1973, Harrison used the name "Spider Harrison" to provide live broadcasting services for a radio station in Indianapolis, Indiana. (*Id*. ¶ 5). In 1971, he signed as a recording artist with Lulu Records under that name. (*Id*. ¶ 6).

From 1980 to the present, Harrison has used the name "Spider Harrison" in connection with radio broadcast shows, as an actor, as a promoter, record label and music producer, as the writer of a print column, and to provide voiceover work. (*Id*. ¶ 13). In 1981, Harrison created and hosted a nationally syndicated weekend radio show called "Spider Harrison's What Ever Happened To…?" (*Id*. ¶¶ 10-11). Harrison has continuously produced this show, which is broadcast on a number of radio stations across the nation, as well as the doo-wop Internet Radio Network. (*Id*.) In around

3

1993, he formed a media production services company called Spider Harrison Productions, through which he produced the "What Ever Happened To….?" show. (*Id*. ¶ 12). In 1999, Harrison joined the Screen Actors Guild under the name "Spider Harrison." (*Id*. ¶ 14). In 2003, he submitted a movie script to Rhino Films under that name. (*Id*. ¶ 14). In December 2008 and January 2009, he hosted two Motown shows using that name. (*Id*. ¶¶ 17, 22). Beginning in 2009, he hosted a three-hour weekend show on a traditional radio station in San Bernadino, California, which is also streamed over the Internet and broadcast in order markets in Tennessee and Kentucky. (*Id*. ¶ 18).

In 2009, Harrison registered the trademark "Spider Harrison" with the U.S. Patent & Trademark Office ("USPTO"), for use in connection with entertainment services. (*Id*. ¶ 23). The USPTO issued the registration on October 26, 2010, as U.S. Trademark Registration No. 3866847 (*Id*.)

### C. Parties' Knowledge of each Other's use of the Mark

In the 1970s, Harrison worked on a Clear Channel radio station with Shottland. (Harrison Aff. ¶¶ 8-9). At the time, Shottland was working under the name "R.P. McMurphy." (*Id*.)

According to Harrison, sometime in the late 1980's he learned from a radio station program director that someone in Minnesota "was using [his] name."[3] (Harrison Dep. 281:2-282:9). Harrison testified that he tried to check up on that information and he looked at Billboard magazine to find that name, but he did not find anything. (*Id*.) He stated that, by the time he located the stations where "Spyder Harrison" reportedly worked, he was no longer there. (Harrison Aff. ¶ 33).

In July 2003, Harrison learned from the executive producer of a movie he acted in that somebody was using the name "Spyder Harrison." (Harrison Dep. 141:15-148:16). Harrison did some internet research, found Shottland, and sent him an e-mail on July 20, 2003. (*Id*.) In the e-mail, Harrison informed Shottland that he was also "Spider Harrison." (ECF No. 26-3). Shottland

responded that he remembered Harrison, that they had worked together for a time at radio station WLAC, and that he went by the name RP McMurphy while at WLAC. (*Id.*) Harrison never asked Shottland to stop using the name. (*Id.*) Harrison then made inquiries at Sirius about Shottland's use of "Spyder Harrison," but never received any adequate response. (Harrison Dep. 141:15-148:16). Harrison testified that, although other people—mostly relatives—kept telling him that some other person was using his name on the radio, he did not continue to follow-up on Shottland's use of the "Spyder Harrison" name because he did not believe Sirius was going to succeed as an alternative to traditional radio. (Harrison Dep. 152:3-154:2).

### D. Alleged Instances of Confusion

Harrison states that he began to experience confusion over both parties' use of the mark for voiceovers in 2009, when a person named Dan Connolly from Marketing Partnership, LLC, in Connecticut sent him an e-mail asking him if he was "the guy on Sirius." (Harrison Aff. ¶ 38; Harrison Dep. 270:18-274:11). Harrison replied that he was not on Sirius. (Harrison Dep. 270:18-274:11). Connolly then asked him if he did voiceovers, to which Harrison answered in the affirmative. (*Id.*) After some negotiation, Connolly decided to hire Shottland instead of Harrison. (*Id.*)

Harrison states he also began to experience confusion over both parties' use of the mark for voice-tracking services in 2009. He states that XM was considering his show "What Ever Happened To. . . ? for a time slot on the network until the merger occurred, after which time no one returned his calls. (Harrison Aff. ¶ 39). Shottland then began airing a show on SiriusXM using the name "Spyder Harrison."

Additionally, beginning around 2009, Harrison claims he began hearing from several friends, former colleagues, and family members about another person using his name on the radio.

---

[3] Shottland contends that Harrison is mistaken as to the date because Shottland only worked in Minnesota

(Harrison Dep. 276:23-280:25). According to Harrison, these individuals expressed concern over another person using his name in that manner. (*Id*.)

Harrison also notes that Shottland admitted he registered websites and social media accounts with the name "Spider Harrison," which redirected Internet traffic to "Spyder Harrison" website and social media pages, "for people who are confused of the spelling of my name." (Shottland Dep. 130:10-20, 133:25-134:3; ECF No. 27-8). Shottland created several Twitter accounts to clarify any confusion over his name. One account was named "@SpyderwithaY"; another account named "@SpiderHarrison" contained the following posted message: "Hey if you are looking for Spyder Harrison on Sirius XM you need to go to Spyder Harrison at SpyderwithaY." (Shottland Dep. 135:21-139:18; ECF Nos. 27-6, 27-7).

On December 6, 2010, after allegedly experiencing several instances of confusion among customers and potential employers, Harrison had his attorney send Shottland a cease-and-desist letter. (ECF No. 26-4). Having failed to reach an amicable solution to this dispute, on January 13, 2011, Shottland filed this action against Harrison. (ECF No. 1). On March 9, 2011, Harrison filed a Counterclaim. (ECF No. 9). Both parties claim they have superior rights to the trademark "Spyder Harrison" or "Spider Harrison."

## II. LEGAL STANDARDS

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56's plain language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

between 1990 to 1991.

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### III. ANALYSIS

**A. Shottland's Motion for Summary Judgment on his Affirmative Defenses**

Shottland asserts a number of affirmative defenses to Harrison's Counterclaim, but moves for summary judgment on just two—laches and statute of limitations. I will address the arguments and the evidence as to each affirmative defense in turn.

**1. *Laches***

Under the defense of laches, a defendant must show (1) a delay in the plaintiff's assertion of a right or claim; (2) the delay was not excusable; and (3) the delay caused undue prejudice. *Citibank, N.A. v. Citibanc Grp., Inc.*, 724 F.2d 1540, 1546 (11th Cir. 1984). Application of this doctrine is flexible and entails an examination of "the amount of delay and the prejudice caused by the delay." *Id.* Whether a defendant's delay is excusable requires an examination into the reasons for the delay. *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1345 (11th

Cir. 1996). "[B]ecause the Lanham Act does not contain a statute of limitations, the period for analogous state law claims is to be used as a touchstone for laches." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986). The limitations period for this type of action in Florida is four years. *Id*.

Shottland argues that the defense of laches bars Harrison's trademark infringement, cyberpiracy, and related common law claims. He notes that Harrison first became aware of Shottland's use of the name "Spyder Harrison" to provide voice-tracking services at Sirius radio, at other traditional radio stations, and on the Internet though websites and social media pages, yet did nothing until December 6, 2010, when Harrison's attorney sent Shottland a cease-and-desist letter. Shottland also appears to argue that Harrison, not he, has the burden of proving the elements of the affirmative defense.

Harrison contends that his seven-year delay was excusable and did not unduly prejudice Shottland. Harrison states that because Sirius was still in its rudimentary beginnings in 2003, he did not have grounds to believe at that time that Shottland was significantly impacting his trademark rights. Harrison maintains that he only began experiencing greater instances of confusion in 2009, shortly before his attorney sent Shottland the cease-and-desist letter. He also notes that Shottland has not demonstrated any undue prejudice as a result of the delay.

Shottland has the burden of proving his affirmative defense. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984) ("[T]he defendant bore the burden of establishing one of the affirmative defenses of either abandonment or laches leading to equitable estoppel."). Shottland provides evidence that Harrison knew about his use of the name "Spyder Harrison" beginning in July 2003. Harrison did nothing to alert Shottland of his objections to his use of the name until December 2010. Shottland states the delay was inexcusable because Harrison had actual knowledge that Shottland was using the name for voiceovers, voice-tracking services, and live

broadcasts nationally through the Internet and satellite radio and locally through traditional broadcasts, and actually reached out to Shottland, yet never asked him to stop using the name.

As to the element of undue prejudice, Shottland testified that, had he known of Harrison's objections he would have discussed the matter with his employers and entertained the possibility of changing or altering his performance. (Shottland Aff. ¶ 16). He states that SiriusXM has marketed its weekly national countdown show for over eight years using the name "Spyder Harrison." (*Id.*) He further states that changing his performance name would cause confusion among his listeners. (*Id.*) By delaying his challenge to Shottland's use, Harrison restricted Shottland's ability to build his listenership and market his services using another name. *See Bridgestone/Firestone Research, Inc. v. Auto. Club de L'Ouest de la France*, 245 F.3d 1359, 1363 (Fed. Cir. 2001) ("Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice."); *cf. Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996) (finding prejudice by delay where delay precluded defendant's ability to "effectively adopt an alternative marketing position.").

In response, Harrison argues that his delay is excusable. Harrison notes that Sirius's subscribers were very low around 2002 and 2003, when he learned of Shottland's use. As of December 31, 2002, Siruis had less that 30,000 subscribers nationwide for 100 separate channels and it remained under 9 million total subscribers for 134 channels throughout the United States until it merged with XM in July 2008, when SiriusXM's listening audience more than doubled. (ECF No. 40-11). Thus, Harrison argues, he was justified in delaying serving a cease-and-desist letter and bringing suit until he realized that Sirius—and by extension Shottland's show—would survive and might significantly impact his rights.

"[D]elay is to be measured from the time at which the plaintiff knows or should know she

has a provable claim for infringement." *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1206 (11th Cir. 1997); *accord Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008). "[A] court should consider, in its assessment of laches, progressive encroachment, damage the plaintiff was suffering, and the likelihood of confusion at the time the plaintiff sued." *Kason Indus.*, 120 F.3d at 1206. Such considerations reflect the principle that "[t]he senior user has no obligation to sue until the likelihood of confusion looms large." *Id*. (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.19 (4th ed. 1997)). Otherwise, trademark owners would always be forced to "sue first and ask questions later." *Id*. (quoting *McCarthy on Trademarks* § 31.19). "[A]ny change in the format or method of use of the mark or expansion into new product lines or territories should be sufficient to excuse prior delay." *McCarthy on Trademarks* § 31:19.

Genuine issues of fact remain as to whether Harrison's delay was justified in light of his perception of Sirius's market position and survivability. *See McCarthy on Trademarks* § 31.19 ("The trademark owner is justified in delaying the unleashing of litigation until it is seen if the infringing business or product line will survive, let alone significantly impact on plaintiff's trademark rights."). Further, the trier of fact must determine whether a laches defense may be viable considering other factors and affirmative defenses, such as unclean hands[4] or the existence of

---

[4] Although Harrison did not move for summary judgment on his unclean hands defense, I note that a finding that Shottland has come before this Court with unclean hands may preclude a laches defense. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825 (7th Cir. 1999) ("A party's unclean hands may stand as an obstacle to the application of the doctrine of laches in certain circumstances. The notion of unclean hands working as a bar to the application of laches stems from the belief that an equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice."). There is some evidence that Shottland is a deliberate infringer, i.e., he knew of Harrison's use of the name "Spider Harrison" before he began using it nationwide on Sirius or on the Internet. *See McCarthy on Trademarks* § 31:9 ("A deliberate infringer lacks good faith, comes into equity with 'unclean hands' and thus cannot claim the equitable defense of laches."). For example, in a 2003 e-mail response to Harrison, Shottland responded that he remembered Spider Harrison, that they had worked together for a time at radio station WLAC, and that he went by the name RP McMurphy while at WLAC.

inevitable confusion.[5] Summary judgment is therefore inappropriate on this defense.

### 2. *Statute of Limitations*

Shottland argues that Count VI of Harrison's Counterclaim, which asserts a claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is barred by the applicable statute of limitations period. FDUTPA claims have a four-year statute of limitations. *Brown v. Nationscredit Fin. Servs. Corp.*, 32 So. 3d 661, 662 n.1 (Fla. Dist. Ct. App. 2010). The statute of limitations begins to run "when the last element constituting the cause of action occurs." *Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F. Supp. 2d 1215, 1223 (S.D. Fla. 2008). The elements of a FDUTPA claim are: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Id*. at 1220. "In construing what constitutes a deceptive act or unfair practice, the Florida Supreme Court has noted that deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Id*. (internal quotation marks omitted).

Shottland does not pinpoint exactly when he contends the statute of limitations period began to run.[6] Harrison does not respond to these arguments. Based on the evidence and arguments before me, I find that there are issues of fact regarding whether this claim is barred by the statute of limitations. As noted above, the deception occurs when the defendant makes a representation, omission or practice that is likely to mislead the consumer to the consumer's determent. Issues of fact remain as to when Shottland's alleged misrepresentation became "likely" to mislead

---

[5] On a showing that likelihood of confusion is inevitable, a laches defense may not bar the entry of injunctive relief. *See Kason Indus.*, 120 F.3d at 1207 ("[I]f the likelihood of confusion is inevitable, or so strong as to outweigh the effect of the plaintiff's delay in bringing a suit, a court may in its discretion grant injunctive relief, even in cases where a suit for damages is appropriately barred."). This issue requires "a careful, fact-intensive consideration." Assuming Shottland succeeds on his laches defense, this Court will reserve ruling on whether injunctive relief is nonetheless appropriate until after it hears the evidence at trial.

[6] Because Shottland set forth his analysis of the laches defense together with the statute of limitations defense this Court cannot discern exactly what facts he is relying on with respect to the statute of limitations argument.

consumers, to the consumers' detriment. Summary judgment is inappropriate on this claim.

### 3. *Request for Attorney's Fees and Costs*

Shottland's motion for attorney's fees and costs is denied without prejudice. Shottland is not a prevailing party. *See Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 903 (11th Cir. 2007) ("In 'exceptional cases,' the district court has the discretion to 'award reasonable attorney fees to the prevailing party.' (quoting 15 U.S.C. § 1117(a)).

### B. Harrison's Motion for Summary Judgment on his Trademark Infringement, Unfair Competition, Cyberpiracy, and Related Common Law Claims

#### 1. *Trademark Infringement and Unfair Competition Claims*

Harrison moves for summary judgment on the following claims: Count I (trademark infringement under the Lanham Act); Count II (unfair competition under the Lanham Act); Count IV (trademark infringement under Florida common law); and Count V (unfair competition under Florida common law). "The elements required to prevail on a claim of common law trade name and service mark infringement are the same as those required to prevail under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) or under a claim for common law unfair competition." *Am. United Life Ins. Co. v. Am. United Ins. Co.*, 731 F. Supp. 480, 486 (S.D. Fla. 1990); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 568 F. Supp. 2d 1369, 1376 (M.D. Fla. 2008) ("The legal standard for unfair competition and trademark infringement under both the Lanham Act and common law has been held to be essentially the same." (internal quotation marks omitted)).

Section 43(a) of the Lanham Act prohibits the use in interstate commerce of any "word, term, name, symbol or device, . . . or any false designation of origin . . . which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a). "To establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or

confusingly similar to its mark, such that consumers were likely to confuse the two." *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010). To evaluate whether a likelihood of confusion exists, a court must consider the following factors: "(1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public." *Id*. at 774-75. "The last factor, actual confusion in the consuming public, is the most persuasive evidence in assessing likelihood of confusion." *Id*. at 779.

Harrison maintains that "Spider Harrison" is an arbitrary mark for entertainment services, which deserves protection from misuse by the junior user, Shottland. He notes that he applied for and obtained a trademark registration from the USPTO for the mark, so it is presumed to be inherently distinctive. Harrison maintains, therefore, that he does not need to provide evidence of secondary meaning. Finally, he also notes that the parties do not dispute that there is a likelihood of confusion between Shottland's use of "Spyder Harrison" and Harrison's use of "Spider Harrison."

There are generally four categories of mark distinctiveness:

> (1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.

*Tana*, 611 F.3d at 774. Generally, personal names, which consist of a combination of a surname and a first name, "are regarded as descriptive terms." *Id*.; *McCarthy on Trademarks* § 13.2. Thus, to establish trademark rights to an unregistered, common law personal name mark, a plaintiff must show the personal name has acquired distinctiveness, i.e., secondary meaning. *See Tana*, 611 F.3d

13

at 774; *Conagra*, 743 F.2d at 1513. "A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer." *Tana*, 611 F.3d at 774. The USPTO, however, permits the federal registration of personal names without proof of secondary meaning; such marks "are deemed to be inherently distinctive under the Lanham Act." *Christopher Brooks v. Creative Arts By Calloway, LLC*, 93 U.S.P.Q 2d 1823, 2009 WL 4081696, at *8 (T.T.A.B. 2009) ("The USPTO continues to view personal names as inherently distinctive and registrable on the Principal Register."); *see also McCarthy on Trademarks* § 13:2.

"Spider Harrison" is a personal name mark. It consists of a combination of Harrison's surname and his first name nickname, "Spider." The USPTO accepted Harrison's application and registered the mark on the Principal Register without requiring a showing of acquired distinctiveness. The personal name mark's registration on the Principal Register is protectable and creates a presumption of acquired distinctiveness. *See, e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (holding a mark is protectable "if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning.'"); *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 876 (9th Cir. 1999) ("[R]egistration on the principal register creates a presumption of distinctiveness—in the case of a surname trademark, acquired distinctiveness."); *In re Leslie Fay Cos.*, 216 B.R. 117, 127 (Bankr. S.D.N.Y. 1997) ("A trademark may be inherently distinctive because it is based upon a personal name which is distinctive."); *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ([R]egistered trademarks are presumed to be distinctive and should be afforded the utmost protection.").

The presumption of distinctiveness, however, is "easily rebuttable, since it merely shifts the burden of production to the alleged infringer." *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 486 (7th Cir. 2007); *accord Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979). The presumption "evaporates as soon as evidence of invalidity is presented." *Door Systems, Inc. v.*

*Pro–Line Door Systems, Inc*., 83 F.3d 169, 172 (7th Cir. 1996) (internal citations omitted).

Shottland provides some evidence to rebut the presumption of validity. He argues that Harrison obtained the registration by fraud because Harrison knew that Shottland was using the "Spyder Harrison" name when he filed his application with the USPTO, yet failed to disclose that information. In support, Shottland points to evidence that Harrison acknowledged Shottland's use of the mark in July 2003, but his USPTO application did not disclose this use. He also disputes the authenticity of some of the documents Harrison provided to the USPTO in support of his application.

In response, Harrison provides evidence to show he had no duty to disclose Shottland's use because he has always maintained that Shottland did not have a right to use the name. *See Rosso & Mastracco, Inc. v. Giant Food Inc*., 720 F.2d 1263, 1266 (Fed. Cir. 1983) ("[I]n some instances a senior user would be making a false oath where he fails to acknowledge conflicting rights of a junior user which are clearly established, for example, by a court decree, by the terms of a settlement agreement, or by a registration. However, the rights of a junior user must be clearly established and must be in an identical mark or one so similar as to be clearly likely to cause confusion."); *Wurzburger Hofbrau Aktiengesellschaft v. Schoenling Brewing Co*., 331 F. Supp. 497, 505 (S.D. Ohio 1971), *aff'd* 175 U.S.P.Q. 391 (6th Cir. 1972) (noting that the oath in an application for registration does not require an applicant to disclose all other persons who may be using the mark; it only requires an applicant to disclose those persons who the applicant believes possesses the *legal right* to use the mark).

Shottland's claim that the registration is invalid is not properly before me because Shottland did not move for summary judgment on it. The question of the registration's validity raises factual issues to be decided by the trier of fact. Even if I were to find, however, that the registration is valid, summary judgment would be inappropriate because issues of fact remain as to the likelihood

of confusion and as to Shottland's laches defense.

To show a likelihood of confusion, Harrison points to one instance of actual confusion by a potential purchaser of voice-tracking services and comments colleagues, friends, and family purportedly made to him about someone else using a similar name on the radio. All of this evidence, of course, amounts to nothing more than hearsay. *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). Harrion notes that Shottland's need to clarify through social media sites that his name is spelled with a Y also evidences confusion among consumers.

In contrast, Shottland states that Harrison presents little or no evidence of confusion among consumers of voiceover and voice-tracking services, which he contends are "sophisticated and discriminating" consumers, such as large national radio networks or individual radio stations, not the listening public.[7] He also notes that Harrison fails to corroborate his own testimony about confusion among listeners of live broadcasts.

Likelihood of confusion is normally a question of fact. *See Alliance Metals, Inc. of Atlanta v. Hinley Indus., Inc.*, 222 F.3d 895, 907 (11th Cir. 2000). I do not find that there is "ample undisputed evidence" before me of a likelihood of confusion, which might warrant summary judgment on the merits of this claim. *See id.* at 908.

### 2. Anticybersquatting Consumer Protection Act Claim

To prevail under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), "a plaintiff must prove that (1) its mark is distinctive or famous and entitled to protection; (2) the defendant's domain name is identical or confusingly similar to the plaintiff's mark; and (3) the defendant registered or used the domain name with a bad faith intent to profit." *Bavaro Palace, S.A. v. Vacation Tours, Inc.,* 203 F. App'x. 252, 256 (11th Cir. 2006). In

---

[7] Although radio stations and networks are purchasers of voice-tracking services, the listening public is also a consumer of those products once they are broadcast. I make no definitive finding on this point because the parties have not provided any evidence or argument on the issue.

16

determining whether the defendant acted with bad faith intent, a court may consider the nine enumerated factors under § 1125(d)(1)(B)(i).[8]

Having reviewed the factors and considered the evidence presented, I find that there are issues of material fact with respect to whether Shottland acted with bad faith intent. There are issues of fact regarding whether Harrison holds a valid federally registered mark, whether Shottland acted with the intent to divert Harrison's consumers and harm his goodwill, or whether Shottland's intent was simply to make sure his own consumers found him because of the non-traditional spelling of his name. There is no evidence that Harrison ever used the name "Spider Harrison" in websites, social media sites, or other Internet self-promotion. In light of these factual issues, summary judgment is improper.

---

[8] The factors are:
(I) the trademark or other intellectual property rights of the person, if any, in the domain name;
(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section [addressing dilution].
15 U.S.C. § 1125(d)(1)(B)(i).

## IV. CONCLUSION

For the reasons explained in this order, it is **ORDERED and ADJUDGED** that (i) Plaintiff and Counterclaim Defendant's Combined Dispositive Motion for Summary Judgment and Request for Award of Attorney's Fees and Costs (ECF No. 26) is **DENIED**, and (ii) Defendant's Motion for Summary Judgment (ECF No. 27) is **DENIED**.

**DONE and ORDERED** in chambers at Miami, Florida, this 10th day of July 2012.

*Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*William C. Turnoff, U.S. Magistrate Judge*
*Counsel of record*